Eva Woodson HINTON, Plaintiff,

v.

The METHODIST HOSPITALS, INC.
and Ron Parker, Defendants.

No. H 90–223.

United States District Court,
N.D. Indiana,
Hammond Division.

Nov. 5, 1991.

Clifford E. Duggan, Jr., Merrillville, Ind., for plaintiff.

R. Lawrence Steele, Hodges, Davis, Gruenberg, Compton & Sayers, Merrillville, Ind., for defendants.

### ORDER AND MEMORANDUM OPINION

MOODY, District Judge.

This court has previously conducted a bench trial in this sex discrimination action brought under Title VII of the Civil Rights Act of 1964 ("Title VII") by plaintiff Eva Woodson Hinton ("Hinton") against her former employer the Methodist Hospitals, Inc. ("Methodist") and her former coworker Ron Parker ("Parker"). At the close of the plaintiff's case in chief, the defendants orally moved for involuntary dismissal of the plaintiff's claims pursuant to Federal Rule of Civil Procedure 41(b). The court granted that motion from the bench and adjourned the trial. The court now renders the following findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 41(b) and 52(a).

### I. BACKGROUND

From June of 1987 through the date of her discharge, Methodist employed Hinton as a cleaning woman. Hinton alleges that her health deteriorated, she missed long

periods of work, and she ultimately lost her job as a result of sexual harassment by Parker. Specifically, Hinton claims that Parker repeatedly made unwanted sexual propositions to her, made unwanted and sexually explicit statements that humiliated her in front of coworkers, physically assaulted her with his bared genitals, and criticized her work only because she had spurned him and complained about his conduct. Hinton alleges that Parker's harassment caused her to miss work from February to August of 1988, and ultimately led to her discharge in retaliation for her complaints to his superior.

Legally, Hinton claims that Parker is personally liable to her as an "employer" under Title VII. Hinton further claims that Methodist is responsible for Parker's conduct because they failed to take action when she complained to Bruno Giacomuzzi, an acknowledged supervisor with authority over both Parker and Hinton. She claims that her termination by Methodist was in retaliation for complaining about Parker within the Methodist system and to the Equal Employment Opportunity Commission.

The defendants respond with two arguments. First, they argue that Ron Parker did not hold a true supervisory position over Hinton, and is therefore not liable to her as an employer under Title VII. Second, they argue that the alleged incidents of harassment or subsequent retaliation never occurred, and that Hinton actually lost her job because personnel at Methodist caught her stealing drugs and carrying a weapon.

## II. FINDINGS OF FACT

1. In accord with the defendants' admissions, the court finds that Methodist was an employer bound by Title VII at the relevant times.

2. The court finds that as a "shift coordinator" Parker was a coworker of Hinton's with supervisory responsibilities, but no power to impose discipline or make decisions on the termination of coworkers. Parker's job did require him to monitor the quality of Hinton's work and to offer criticism of her performance. He could also recommend to his superiors that a coworker in Hinton's position receive discipline. However, Methodist committed the final decision on disciplinary action to management employees. In making this finding, the court credits the uncontradicted evidence of Parker and his supervisor, Bruno Giacomuzzi.

3. The court finds it more likely than not that Parker made one sexually oriented remark to Hinton. The court finds that the remark occurred in a specific context. A group of male and female coworkers regularly gathered in a break area and engaged in conversation that often included physical or sexual humor, which in one instance led to a discussion of "wild" or stray hairs and Parker remarking to Hinton: "Eva, where is your hair?" The court finds that Parker's remark was not welcomed by Hinton, and caused her some embarrassment. In making this finding, the court notes that Parker testified to vaguely recalling the remark and its context, though he denied responsibility. The court credits the testimony of Angela Cruz, who was present, in attributing the remark to Parker.

4. The court finds that Hinton's other allegations of sexually oriented behavior by Parker are untrue. The court finds that Parker never asked Hinton out, never subjected her to other remarks or comments, and never fondled or assaulted her. In making this determination, the court notes that the issue turns almost entirely on the credibility of Hinton as against Parker. The court assessed Parker's testimony as sincere and credible in every instance except his equivocation and denial with regard to the hair remark. By contrast, the court found Hinton a strikingly poor witness, whose demeanor provoked deep skepticism in the court.

There are, however, two noteworthy items of corroborating evidence for Hinton's account of the alleged harassment. First, Hinton complained to Giacomuzzi about Parker. But the corroborating effect of reporting the alleged harassment was substantially reduced by Giacomuzzi's testimony that Hinton could not provide

detailed descriptions of the alleged harassment. For example, the court credits Giacomuzzi's testimony that Hinton never recounted an assault involving bared genitals. The court further credits his testimony that Hinton declared she had never been touched by Parker. Moreover, Hinton could not identify dates of the alleged harassment; the only date Hinton did provide to Giacomuzzi turned out to be a day on which she was absent from work.

Second, Matlynn Johnson, a coworker and friend of Hinton's, testified that Hinton told her of the alleged assault involving bared genitals on the day it happened. Johnson also testified that Parker had harassed her as well as Hinton. The court, however, does not credit Johnson's testimony. It is an uncontroverted fact that Parker had caught Johnson sleeping at work, and that he reported her to management personnel, who in turn disciplined her. Out of that disciplinary action by Methodist arose a union grievance by Johnson. Thus, there is a history of bad blood between Johnson and Parker. Johnson's history of friendship for Hinton and animosity toward Parker, together with Johnson's poor demeanor on the witness stand, lead the court to conclude that her testimony is not credible.

5. The court finds that Methodist, through Giacomuzzi, took prompt remedial measures in response to Hinton's complaints against Parker. Specifically, Giacomuzzi investigated the allegations, confronted Parker, and, though concluding that the allegations were baseless, put Parker on a different shift to avoid friction with Hinton.

6. The court finds that Hinton's extended absences from work before her termination were caused by her health problems. The court notes a complete lack of credible evidence supporting an inference that Hinton's health problems arose from her work situation.

7. The court finds that at the time of Hinton's termination she had (1) attempted to steal drugs from Methodist while on duty, and (2) brought a large, combat-style folding knife to work with her. In making these determinations, the court relies on Hinton's admissions concerning the knife, and discredits her testimony denying responsibility for the drug theft.

### III. CONCLUSIONS OF LAW

Hinton's complaint and trial brief are the only documents of record that address the merits of her claim. Neither is a model of exactitude or clarity. The court concludes that Hinton's action contains: (1) a hostile work environment claim against Parker, (2) a retaliatory discharge claim against Parker, (3) a retaliatory discharge claim against Methodist, (4) a quid pro quo claim against Parker, and (5) a vicarious liability claim against Methodist for Parker's alleged violation of Title VII.

#### A. Hostile Work Environment: Parker

Hinton's hostile work environment claim against Parker fails for two reasons, each of which is independently sufficient to bar recovery under Title VII. First, Parker was not an employer of Hinton within the meaning of the statute because he was a coworker rather than a managerial supervisor. *See Zabkowicz v. West Bend Co., Div. Dart Indus.*, 789 F.2d 540, 546 (7th Cir.1986) ("Title VII does not provide a means for an employee to sue a non-supervisory co-worker for discriminatory acts."). The evidence at trial showed the court that he bore some supervisory *responsibility* for her work, but that he had no supervisory *authority* to affect the terms and conditions of her employment. He did have the role of monitoring Hinton's work and reporting derelictions of her duty to their mutual superiors in management, but the court holds that an employer under Title VII should have a more substantial role in employment decisions before liability will attach. *See Guess v. Bethlehem Steel Corp.*, 913 F.2d 463 (7th Cir.1990) (court considered factory foreman coworker, though issue not raised by parties). Hinton argues that Parker is liable because his job gave him the role of recommending disciplinary action to those who actually impose it at Methodist. At trial, the court asked Hinton's counsel to cite a case standing for the proposition that the power to

recommend discipline turns a coworker into a supervisor-employer. Hinton's counsel conceded that he could cite no such case, nor has the court found one. The closest case from the Seventh Circuit, while not directly confronting the issue, suggests that Hinton's theory is wrong. *See Hueb-schen v. Department of Health & Social Services*, 716 F.2d 1167, 1168–70 (7th Cir. 1983) (parties agreed that supervisor who recommended termination of employee under her was not Title VII employer). *But see North v. Madison Area Ass'n for Re-tarded Citizens–Developmental Centers Corp.*, 844 F.2d 401, 407 (7th Cir.1988) (noting possible strict liability of employer where true supervisor "controlled or influenced" ultimate decision by another); *Kep-pler v. Hinsdale Township High School District*, 715 F.Supp. 862, 866 n. 3 (N.D.Ill. 1989) (citing *North*). The court holds that Parker had insufficient authority over Hinton to be considered her employer, and he cannot be held personally liable to her under Title VII.

 Alternatively, even assuming Parker's position did render him amenable to suit under Title VII, the court holds that no hostile work environment existed. "In these cases a plaintiff establishes her claim by demonstrating that her employer 'has created a hostile or abusive working environment.'" *King v. Board of Regents of Univ. of Wisconsin Sys.*, 898 F.2d 533, 537 (7th Cir.1990) (quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)). *See also Moffett v. Gene B. Glick Co.*, 621 F.Supp. 244, 266–67 (N.D.Ind.1985) (noting inapplicability of standard burden shifting analysis and listing set of elements commonly applied to harassment claims). Hinton need not show loss of any tangible benefit because "harassment itself affects the terms and conditions of employment." *King*, 898 F.2d at 537. But Title VII will not provide a remedy unless the proved harassment reaches a level implicating the statute's policy of protecting the fundamental nature of the employment relationship from sex discrimination.

The harassment ... "must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Vinson*, 106 S.Ct. at 2405 (citations omitted). It must deny the plaintiff "the right to participate in the workplace on equal footing with others similarly situated." *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210 (7th Cir.1986). *See also Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180 (7th Cir.1986). Although a single act can be enough, *Bohen*, 799 F.2d at 1186–87, generally, repeated incidents create a stronger claim of hostile environment, with the strength of the claim depending on the number of incidents and the intensity of each incident. In applying this test, we look at the harassment from both the objective and subjective viewpoint of the plaintiff: in order to find discrimination, the court must conclude that "the conduct would adversely affect both a reasonable person and the particular plaintiff bringing the action." *Brooms v. Regal Tube Co.*, 881 F.2d 412 (7th Cir.1989).

*King*, 898 F.2d at 537. In this case, Hinton's proof failed to establish any unwelcome sexual attention beyond the one "wild hair" remark, and Hinton established that incident by only the barest preponderance of the evidence. While the court assesses that incident as unwelcome and embarrassing to Hinton, it was not part of any wider pattern of abuse. Further, it did not appear to the court as an effort to intentionally abuse Hinton or interfere with her work. Rather, the evidence concerning the context of the statement shows the court that, more likely than not, Parker made the remark believing it would not be an unwelcome item of banter. The evidence did show that Hinton was not disposed to participate in the sexually oriented humor that typified her free time with this or similar groups of coworkers, but that she made herself a part of their other conversations. In a more satisfactory world, Parker would have known better. But, this one incident, as developed in the testimony at trial, does not amount to a hostile work environment under Title VII. The court holds that reasonable persons in Hinton's position would

not conclude that this one remark had altered their terms or conditions of employment, nor that the remark had denied them an equal footing in the workplace. The court further concludes that, more likely than not, Hinton did not conclude that this remark altered the nature of her own employment. Thus, assessing the incident from both the objective and subjective viewpoint of the plaintiff, the court concludes that it did not create a hostile work environment for Hinton. *See Keppler,* 715 F.Supp. at 867 (single offensive incident generally insufficient under hostile environment theory).

### B. Retaliatory Discharge: Parker & Methodist

■■■■ As for the retaliatory discharge claims, the court is at a loss in considering the claim against Parker. The evidence developed through Hinton's witnesses, on direct and cross examination, gave no hint that Parker had even the slightest influence on Methodist's decision to terminate Hinton. And while the claim against Methodist is somewhat more coherent insofar as Methodist actually discharged Hinton, the evidence did not support any inference of retaliatory or discriminatory intent on Methodist's part. Rather, the evidence overwhelmingly established that Methodist fired Hinton only after she committed two gross violations of duty: stealing drugs and carrying a weapon.

Legally, Hinton's retaliation claim finds no support in direct evidence. Accordingly, she must rely on the indirect or burden shifting method of proof established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Hinton's evidence fails at both the prima facie and the pretext stages of *McDonnell Douglas.* As discussed above, Hinton adduced no evidence sufficient for this court to infer sex discrimination by Parker, the alleged protagonist in this case. Thus, there is no prima facie violation of Title VII for Methodist to explain.

Even assuming the evidence allowed a prima facie inference of discrimination by Parker, Methodist's two reasons for firing Hinton remain. Hinton did attempt to show that these reasons were insufficient or pretextual. But in this she failed utterly. Initially, the court notes that it does not sit as an appellate tribunal over the personnel departments of private entities such as Methodist. With regard to non-discriminatory business decisions, "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII [does] not interfere." *Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557, 560 (7th Cir.1987) (race case). Rather, this court's concern is with the question of whether or not Methodist has given an honest explanation for its conduct. *See generally Russell v. Keyes Fibre Co.,* 771 F.Supp. 951, 954–57 (N.D.Ind.1991) (ADEA case applying *McDonnell Douglas* ). Hinton would have this court believe that stealing drugs and carrying a weapon were not the real explanation for her termination. Hinton would have the court believe that sex discrimination and retaliation for her complaints were the real motivation for her discharge, while Methodist's reasons were merely pretexts for that discrimination.

On their face, Methodist's reasons do not strike the court as particularly implausible reasons for firing an employee. Nor does Hinton's evidence cast any substantial doubt on Methodist's reasons, as offered through Giacomuzzi, whose testimony the court found highly credible. Hinton did present testimony that a pharmacy worker gave her one of the items, an enema kit, and that a coworker stole the rest of the drugs and hid them on Hinton's cleaning cart where all the drugs were found concealed within a garment. But the court does not credit that evidence, or even draw from it the inference that Methodist was likely mistaken in concluding that Hinton was a thief, let alone opportunistic in using the incident to justify a discriminatory discharge. Hinton further presented evidence that she needed the knife at issue to protect herself. This evidence served only to call into question Methodist's run of the mill business judgment that its employees should not carry weapons, a judgment this court will not—may not—second guess.

In sum, the court holds that Hinton has not established a prima facie case allowing an inference of discriminatory or retaliatory motivation for her discharge, and even if she had, Methodist has articulated cogent reasons for firing Hinton, whose flimsy and implausible attempts to characterize those reasons as pretextual are wholly unpersuasive.

### C. Quid Pro Quo: Parker

■ Turning to the quid pro quo claim against Parker, there are three independently sufficient reasons why Hinton cannot prevail. First, Parker was not Hinton's employer within the meaning of the statute. Second, even assuming that Parker was an employer under Title VII, there is no sufficient evidence to raise even an inference that Parker intentionally directed sexually abusive conduct at Hinton to obtain sexual favors. Third, even assuming both (1) that Parker was an employer under Title VII, and (2) that he directed sex based abuse at her, Hinton suffered no loss of a tangible employment opportunity or benefit as a result of Parker's conduct.

■ The court's first two reasons for rejecting the quid pro quo claim against Parker are sufficiently discussed above. As for the third reason, the court notes initially that loss of a tangible employment opportunity or benefit is a required element of a quid pro quo claim as opposed to a hostile work environment claim. *See Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456, 461 (7th Cir.1990) (citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1413 (10th Cir.1987) and 29 C.F.R. § 1604.11(a)). Hinton's complaint and trial brief suggest two candidates for such a loss: her extended absence from work and her termination. Hinton's evidence, however, fails to support these candidates. The court concludes it is far more likely than not that Hinton missed work for her own health reasons, unconnected to the alleged harassment. Further, consistent with the overwhelming nature of the evidence presented at trial, this court has held above that Hinton's termination was the result of her attempt to steal Methodist's property and her decision to carry a weapon at work, rather than the alleged spurning of Parker. *See Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d at 461 (determination of intent committed to district court absent clear error).

### D. Vicarious Liability: Methodist

■ Finally, the court turns to the claim against Methodist premised on vicarious liability for Parker's conduct. Generally, there are two types of vicarious liability in Title VII. There is strict liability for the conduct of supervisory employees acting within the scope of their actual or apparent authority as agents of the employer. *North v. Madison Area Ass'n for Retarded Citizens–Developmental Centers Corp.*, 844 F.2d 401, 407–08 (7th Cir.1988). There is also negligence liability for the acts of employees who are merely coworkers of a victim. There has been some confusion in the caselaw over what this latter type of liability should be called, and how it should be analyzed. Judge Posner explored this circuit's position on the issue in *Guess*, which explains that the liability concept at issue is not respondeat superior, but more akin to the "fellow servant" rule.

> Under that rule, as under Title VII, the employer, provided it has used due care in hiring the offending employee in the first place, is liable for that employee's torts against a coworker only if, knowing or having reason to know of the misconduct, the employer unreasonably fails to take appropriate corrective action. The employer acts unreasonably either if it delays unduly or if the action it does take, however promptly, is not reasonably likely to prevent the misconduct from recurring.

*Guess*, 913 F.2d at 465 (citations omitted).

The court has already held that Parker did not subject Hinton to either a hostile work environment or quid pro quo discrimination. This is enough to defeat the agency claim against Methodist. But even assuming Parker had abused Hinton in these ways, Parker was a coworker rather than a true supervisor, and Methodist took prompt remedial action. Thus, the negligence principle of *Guess* applies. Applying it, there is no evidence that Methodist hired Parker

with some knowledge that he was likely to commit sex discrimination. Moreover, Giacomuzzi quickly investigated Hinton's sketchy allegations and put Parker on another shift. In these circumstances, Methodist is insulated from Title VII liability for Parker's alleged actions. *Id.* at 464–65.

## IV. CONCLUSION

For the reasons discussed above, the court DIRECTS the clerk of court to enter separate form of final judgment against the plaintiff and in favor of the defendants pursuant to Federal Rule of Civil Procedure 58.*

---

* On October 21, 1991, the plaintiff filed a *pro se* document captioned "Motion to Extend Time for Filing Notice of Appeal." This motion was unnecessary. The plaintiff has thirty days from the entry of judgment on this court's docket in which to appeal. FED.R.APP.P. 4(a)(1). As judgment has not yet been entered by the clerk, the notice of appeal clock has not even started to run.