**Satyendra Nath DUTT, Plaintiff,**

v.

**DELAWARE STATE COLLEGE, Defendant.**

**Civ. A. No. 92–1 MMS.**

United States District Court, D. Delaware.

Jan. 28, 1994.

---

*MEMORANDUM OPINION*

SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

Plaintiff, Satyendra Nath Dutt ["Dutt"] alleges defendant, Delaware State College ["DSC"] discriminated against him on the basis of his national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1993) ["Title VII"]. Docket Item ["D.I."] 1. Specifically, plaintiff argues defendant's promotion and tenure process was poisoned by discrimination, particularly below the administration level. D.I. 53. During a pretrial conference, the parties disagreed as to the resolution of one legal issue: whether DSC employees below the administration level who participate in the promotion and tenure process are "agents" of the college as defined in § 2000e(b) of Title VII.

This opinion addresses that issue. For the reasons which follow, the Court holds DSC employees below the administration level are agents of the college, so long as they participate in the promotion and tenure process to such an extent that they significantly control or influence the decisions which govern some aspect of the compensation, terms, conditions or privileges of employment. Solely by reference to the Collective Bargaining Agreement ["the Agreement"], the Court further finds the following individuals are agents of the college to the extent they conduct themselves in accordance with the Agreement: (1) Departmental Personnel Committee members, including the Committee Chairperson; (2) Promotion and Tenure Committee members, including the Committee Chairperson; (3) Ad Hoc Appeal Committee members, including the Committee Chairperson; (4) Vice Presidents; (5) Presidents; and (6) Board of Trustee members, including those sitting on the Educational Policy Committee.

## II. FACTUAL BACKGROUND

During the academic years 1983–84 to 1990–91, DSC employed Dutt, a male native of India, as an Associate Professor in the Department of Economics and Business Administration. D.I. 47 at 3; D.I. 53 at 3.[1]

Eugene J. Maurer, Wilmington, DE, of counsel: Alan B. Epstein, of Jablon, Epstein & Wolf, Philadelphia, PA, for plaintiff.

Catherine T. Hickey, of Schmittinger & Rodriguez, Dover, DE, for defendant.

---

1. The Court cites to the statements of facts contained in the briefs because neither party has provided a complete factual record in support of those statements. This may be because the parties believe, as plaintiff notes, the present issue "is purely a question of law." D.I. 53 at 3. The

For the 1990–91 academic year, DSC issued Dutt a terminal contract because Dutt had not been granted tenure. D.I. 47 at 3; D.I. 53 at 3. Pursuant to the Agreement between DSC and the American Association of University Professors ["AAUP"], a tenure applicant is given a terminal contract if he or she does not achieve tenure in six years. *Id.;* D.I. 48 at A31 (§ 8.4.7).

The Agreement also governs the promotion and tenure process. After an application for promotion and tenure has been submitted and the applicant has reviewed his or her personnel file, the members of the applicant's department form a Departmental Personnel Committee "to make recommendations concerning appointment, reappointment, promotion, and tenure of members of the department and to conduct peer evaluations for the above purposes." D.I. 48 at A34 (§ 8.6.6). The Department Chairperson then refers "the complete dossier" to the Chair of the Promotion and Tenure Committee. *Id.* (§ 8.6.7). The Promotion and Tenure Committee reviews the "personnel file, evaluations, recommendations, and all supporting documents," and its Chairperson makes his or her recommendation to the appropriate Vice President. *Id.* at A35 (§§ 8.6.9—8.6.11). The Vice President reviews all the accumulated documents, making "appropriate comments and recommendations" to the President, who makes his or her recommendation to the Educational Policy Committee of the Board of Trustees. *Id.* at A25 (§ 7.5.4); *id.* at A35 (§§ 8.6.11, 8.6.14). "The appropriate Vice President and the President of the College shall normally recommend reappointment based upon the favorable recommendation of the majority of those in the department responsible for evaluating a probationary unit member." *Id.* at A25–A26 (§ 7.5.4). The Agreement is silent as to what those officials normally should do based upon an unfavorable recommendation by a majority of the department.

If an applicant wishes to appeal the decision of the Promotion and Tenure Committee, that decision is reviewed by an Ad Hoc Appeals Committee. The Ad Hoc Appeals Committee makes its recommendation to the President, who "shall review the recommendations ... and all supporting documents" and submit his or her recommendation to the Educational Policy Committee of the Board of Trustees. *Id.* at A35 (§ 8.6.14). Whatever the route which the application takes, "[f]inal approval rests with the Board of Trustees," although recommendations "shall be given serious consideration in the final decision." *Id.* at A35 (§ 8.6.18). Such recommendations, indeed "[a]ll materials used in the promotion or tenure process shall become part of the unit member's personnel file." *Id.* at A37 (§ 8.8.1).

The Agreement also notes that "[e]ven though value judgments by those responsible for making promotion and tenure decisions will always play a role in determining who is promoted or granted tenure, documented evidence consistent with the mission statement of [DSC] must be used to support the decisions." *Id.* at A27 (§ 8.1.2). Those decisions are to be based upon two criteria: qualifying and judgmental. *Id.* at A29 (§ 8.3.4). "Qualifying criteria" are the minimal professional qualifications which an applicant must meet for each desired position. An applicant for the rank of Professor, for example,

> must have a record of outstanding performance normally involving both teaching and research or creativity or performance in the arts, or recognized professional contributions in his field. The faculty member must hold the earned doctorate from a regionally accredited institution in a discipline appropriate to the assigned academic department and have at least ten (10) years of effective and relevant experience directly related to his anticipated responsibilities.

*Id.* at A19 (§ 7.3.1). Further, "[t]o be eligible for promotion to Professor, a faculty member shall have been an Associate Professor for at least four years." *Id.* at A29 (§ 8.3.6). "Judgmental criteria" are the following three factors used by each participant

parties having thus framed the legal issue without complete factual support, the Court will issue its opinion solely on the law and how that law applies to the evidence in the record, the most complete portion of which are the relevant sections of the Agreement. In any case, the factual record will be developed fully at the trial scheduled to commence on February 22, 1994.

in the promotion and tenure process: professional competence; professional recognition; and professional service. *Id.* at A32–A33 (§ 8.5.2). "Additional judgmental criteria may be developed by the individual departments as they apply to that discipline." *Id.* at A33 (§ 8.5.3). Participants in the process are to apply the three criteria "more rigorously in considering tenure" than in considering a promotion, and in any case, are to give professional competence the greatest weight. *Id.* (§ 8.5.4).[2]

Dutt applied for both promotion and tenure in the 1986–87 academic year. D.I. 53 at 4. The Department Chairperson recommended "yes" as to both promotion and tenure.[3] *Id.* The Promotion and Tenure Committee voted "no" as to both. *Id.* Thereafter, the Ad Hoc Appeals Committee recommended "yes" as to both, as did the Vice President. *Id.* The President recommended "no" as to both, and the Board of Trustees denied Dutt promotion and tenure. *Id.* Dutt appealed this decision, and the matter was remanded to the Departmental Personnel Committee for reconsideration during the 1987–88 academic year. *Id.*

In the 1987–88 academic year, the Departmental Personnel Committee recommended "no" as to both promotion and tenure. *Id.* The Department Chairperson recommended "yes" as to both. *Id.* The Promotion and Tenure Committee voted "no" as to promotion but "yes" as to tenure. *Id.* The Ad Hoc Appeals Committee voted "no" as to promotion. *Id.* The Vice President did not recommend promotion or tenure, nor did the

President, and the Board of Trustees did not grant promotion or tenure. *Id.*

In the 1989–90 academic year, Dutt applied again for promotion and tenure, but the Departmental Personnel Committee voted "no" as to both. *Id.* The Department Chairperson recommended "yes" as to both. *Id.* The Promotion and Tenure Committee voted "yes" as to promotion but "no" as to tenure. *Id.* The Vice President voted "no" as to both, as did the President. *Id.* The Board of Trustees denied Dutt promotion and tenure and issued him a terminal contract, which expired in May of 1991. *Id.* at 4–5. In July of 1990, Dutt filed a charge of discrimination with the Equal Employment Opportunity Commission ["EEOC"], stating: "I believe I have been discriminately denied tenure and promotion because of my national origin, East Indian." D.I. 48 at A51. After investigating, the EEOC issued a determination, dated September 30, 1991 and mailed October 4, 1991, which found that "the evidence obtained during the investigation does not establish a violation of [Title VII]." *Id.* at A54.

Dutt contends the review at two levels, the Departmental Personnel Committee and the Promotion and Tenure Committee, was "poisoned by unlawful bias against him based on his national origin and that this poison tainted the entire process against him." D.I. 53 at 5. Plaintiff highlights, for example, a Departmental Personnel Committee meeting held on November 11, 1987, at which Dr.

---

**2.** The record is insufficient to determine whether the promotion and tenure process, as set out in the agreement, was observed in this case. Plaintiff has submitted nothing in support of his brief. The sole record, submitted by defendant, contains the following correspondence: (1) a November 15, 1989 letter from Lizzie Waller–Townsend ["Waller–Townsend"], Chairperson of the Departmental Personnel Committee, to Dr. James Valle ["Valle"], Chairperson of the Promotion and Tenure Committee, regarding the vote of the Departmental Personnel Committee (D.I. 48 at A40); (2) a November 15, 1989 letter from Waller–Townsend to Valle regarding her recommendations (*id.* at A41–A42); (3) a December 5, 1989 letter from Dr. Winston Awadzi, Chairperson of the Departmental Personnel Committee, to Valle regarding his recommendations (*id.* at A43–A44); (4) a February 1, 1990 letter from Valle to Dr. Henry N. Tisdale ["Tis-

dale"], Interim Vice President and Dean of Academic Affairs, regarding the recommendations of the Promotion and Tenure Committee (*id.* at A45); (5) two February 15, 1990 letters from Tisdale to Dr. William B. DeLauder ["DeLauder"], President, regarding his recommendations (*id.* at A46, A47); and (6) a February 20, 1990 letter from DeLauder to William H. Davis, Chairman of the Educational Policy Committee of the Board of Trustees, regarding his recommendations (*id.* at A48). *See id.* at A49–A50 (summary chart of recommendations for promotion and tenure of all applicants).

**3.** Neither party indicates the recommendations, either for promotion or tenure, of the Departmental Personnel Committee for the 1986–87 academic year.

Raymond Grandfield ["Grandfield"] suggested the members disregard Dutt's academic criteria and decide his application by just "looking at the man." *Id.* According to plaintiff, Grandfield stated Dutt "does not fit in," and that "we do not need his kind anymore in our department." *Id.* After this meeting, two committee members, Lillie M. Saulsbury and Lizzie Waller–Townsend, wrote a letter to the President of DSC, Dr. William B. DeLauder, informing him the committee meeting was "not only unprofessional but bias[ed] and racist." *Id. See also* D.I. 48 at A41–A42. At another meeting, during which members were to consider Dutt for another position, plaintiff maintains Grandfield was more explicit, stating that "we don't need an Indian as MBA Director." *Id.*

Dutt also highlights a later meeting at which Grandfield was invited to address the Promotion and Tenure Committee regarding Dutt's application for promotion and tenure. According to plaintiff, at that meeting, Grandfield gave the Committee "patently and demonstrably false information" that a legal judgment had been entered in favor of DSC and against Dutt for a $5,000 phone bill, and that DSC had attached Dutt's wages to recover this amount. *Id.* at 6. Plaintiff argues these comments directly influenced the decisions of the Departmental Personnel Committee and the Promotion and Tenure Committee.[4] *Id.*

Defendant, for its part, argues these facts do not indicate bias, but indicate that for legitimate reasons, the Promotion and Tenure Committee "was alarmed at the prospect of providing a 'lifetime contract' " to Dutt. D.I. 47 at 9. Even if the actions of various committee members could be construed to evidence bias, however, defendant maintains those members "are not officers, directors, or supervisors of [DSC] or [Dutt] and therefore,

their conduct cannot result in liability of [DSC] under Title VII of the 1964 Civil Rights Act." D.I. 47 at 2.

## III. DISCUSSION

Title VII prohibits only those unlawful employment practices engaged in by "an employer." 42 U.S.C. § 2000e–2(a) (1993). An employer is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, *and any agent of such a person....* " *Id.* § 2000e(b) (emphasis added). In *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986), the United States Supreme Court held this definition indicates employers are not to be held strictly liable for the acts of their employees. To the contrary, this definition "evinces an intent to place some limits upon the acts of employees for which employers ... are to be held responsible" under Title VII.[5] *Id.* Those limits are to be determined by reference to common law principles of agency. *Id. See* Restatement (Second) of Agency §§ 219–237 (1958).

Courts consistently have construed the terms "employer" and "agent" liberally to effectuate the remedial purpose of Title VII. *Duva v. Bridgeport Textron,* 632 F.Supp. 880, 882 (E.D.Pa.1985) (citing cases). *See Hamilton v. Rodgers,* 791 F.2d 439, 442 (5th Cir.1986) ("[i]n ascertaining the scope of agency, ... Title VII 'should be accorded a liberal interpretation in order ... to eliminate the inconvenience, unfairness, and humiliation of ethnic discrimination"). In general, that liberal construction means that the acts of supervisory employees are imputed to their employer. *Levendos v. Stern Entertainment,* 909 F.2d 747, 751 (3d Cir.1990) (citing *Meritor,* 477 U.S. at 75, 106 S.Ct. at

---

**4.** Apart from the foregoing direct evidence, plaintiff asserts there is indirect evidence which supports a finding of discrimination. As a part of that indirect evidence, Dutt compares his credentials to those of Dr. John Stith ["Stith"], a black male in his department who has been tenured as an Assistant Professor. *Id.* This claim is not relevant to the present issue.

**5.** The Seventh Circuit Court of Appeals has noted that while this holding "was limited in its facts to a claim of sexual harassment, the conclusions reached by the Court are, in our opinion, not so limited, but rather apply to any claim under Title VII in which employer liability is an issue." *North v. Madison Area Ass'n for Retarded Citizens,* 844 F.2d 401, 407 n. 7 (7th Cir.1988). The Court agrees.

2409). The hierarchical structure of some employers, however, makes the term "supervisory employee" difficult to define. Although one might easily identify the "supervisor" among factory workers, for example, one might have more trouble among college professors.

Recognizing this difficulty, the courts in this circuit have provided a more detailed definition of the statutory terms "employer" and "agent." The Third Circuit Court of Appeals has held that "[a] person is an agent under § 2000e(b) if he participated in the decision-making process that forms the basis of the discrimination." *Id.* at 752 (citing cases). *Accord Hamilton v. Rodgers,* 791 F.2d 439, 443 (5th Cir.1986). Similarly, the United States District Court for the District of New Jersey has held the term "employer" extends to "all who significantly control access to employment, whether technically employers or not." *Guyette v. Stauffer Chem. Co.,* 518 F.Supp. 521, 526 (D.N.J.1981). *Accord Duva v. Bridgeport Textron,* 632 F.Supp. 880, 882 (E.D.Pa.1985).

Courts in other circuits have formulated analogous standards. Focusing on statutory language, the United States District Court for the Western District of New York noted that courts "have construed agent in the Title VII context '... to encompass persons who are not employers in conventional terms, but who nevertheless control some aspect of an individual's compensation, terms, conditions or privileges of employment." *Vesey v. Grover,* 780 F.Supp. 991, 993 (W.D.N.Y.1992) (quoting *Bostick v. Rappleyea,* 629 F.Supp. 1328, 1334 (N.D.N.Y.1985), *aff'd mem. sub nom. Bostick v. Cochrane,* 907 F.2d 144 (2d Cir.1990)). Similarly, another court held an employee was not an agent because he "had no supervisory authority to affect the terms and conditions of [plaintiff's] employment." *Hinton v. Methodist Hosps., Inc.,* 779 F.Supp. 956, 959 (N.D.Ind.1991). Both standards parallel the prohibitive language of Title VII. *See* 42 U.S.C. § 2000e–2(a)(1)

(1993) ("[i]t shall be an unlawful employment practice for an employer ... otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment").

Focusing on agency principles, the Seventh Circuit Court of Appeals has held an employer is liable for acts of its employee if that employee acts within the scope of his or her authority. That is, the employer is liable if its employee "either had the direct authority to fire ... or that he, at the very least controlled or influenced the decision of the entity which had such authority." *North v. Madison Area Ass'n for Retarded Citizens,* 844 F.2d 401, 407 (7th Cir.1988). The extent of decisional involvement also was at issue in *Rivas v. State Bd.,* 517 F.Supp. 467, 470 (D.Colo.1981), in which the United States District Court for the District of Colorado stated an employee may be considered an employer or its agent without having "total control or ultimate authority over hiring decisions." Instead, the court held that "[i]f the involvement is sufficient and necessary to the total employment process, the individual is considered an employer." *Id. See also Hendrix v. Fleming Cos.,* 650 F.Supp. 301, 302 (W.D.Okla.1986) ("generally ... to be an employer for purposes of Title VII, an individual must be an officer, director or supervisor ... or otherwise involved in managerial decisions").

Finally, the United States District Court for the District of Maryland summarized all of the foregoing standards in the context of an unsuccessful application for a professorship at a public university.[6] In *McAdoo v. Toll,* 591 F.Supp. 1399, 1405–06 (D.Md.1984), the court noted those standards, which may hold liable those not considered conventional "employers," fulfill the goals of Title VII: "Holding responsible those who control the aspects of employment accorded protection under Title VII is consistent with the congressional intent ... that [its] effectiveness not be frustrated by an employer's delegat-

---

**6.** Defendant cites the case of *Kumar v. Bd. of Trustees,* 774 F.2d 1, 2 (1st Cir.1985), *cert. denied,* 475 U.S. 1097, 106 S.Ct. 1496, 89 L.Ed.2d 896 (1986), for the legal proposition that in a university context, the denial of tenure is "embodied exclusively" in the decision of the final decisionmaker. D.I. 55 at 10. The Court does not agree with this interpretation. In that case, the First Circuit Court of Appeals held, on the basis of a complete factual record, that there was no evidence of discrimination on the part of the decisionmakers. *Kumar,* 774 F.2d at 2.

ing authority." *Id.* at 1406. Accordingly, that court held "those individuals who are charged with the responsibility of making—or contributing to—employment decisions for the [university] are liable as its agents under Title VII." *Id.*

■ The Court finds these standards do not differ substantively from those enunciated by the courts of this circuit, and indeed, are helpful in evaluating the relationship between a college and the professors which it involves in the promotion and tenure process. Accordingly, the Court holds college employees below the administration level are agents of the college, so long as they participate in the promotion and tenure process to such an extent they significantly control or influence the decisions which govern some aspect of the compensation, terms, conditions or privileges of employment. Given the record, which is presently incomplete, the Court declines to address whether the actions of specific individuals, as part of the actual promotion and tenure process, were sufficient to make them "agents." The Court will, however, address the agency relationship solely by reference to the Agreement, which by its terms governs the promotion and tenure process.

■ Several individuals, whether as members of a committee or not, are involved in that process. Those who initially take part are members of the applicant's own department, who form the Departmental Personnel Committee. Pursuant to the Agreement, the members of that committee "make recommendations concerning appointment, reappointment, promotion, and tenure of members of the department and ... conduct peer evaluations for the above purposes." D.I. 48 at A34 (§ 8.6.6). Those recommendations and evaluations become part of the applicant's "complete dossier," which the Department Chairperson refers to the Chair of the Promotion and Tenure Committee. *Id.* (§ 8.6.7). The Promotion and Tenure Committee reviews the "personnel file, evaluations, recommendations, and all supporting documents," and its Chairperson makes his or her recommendation to the appropriate Vice President. *Id.* at A35 (§§ 8.6.9–8.6.11). The Vice President reviews all the accumu-

lated documents, making "appropriate comments and recommendations" to the President, who makes his or her recommendation to the Educational Policy Committee of the Board of Trustees. *Id.* at A25 (§ 7.5.4); *id.* at A35 (§§ 8.6.11, 8.6.14).

If an applicant wishes to appeal the decision of the Promotion and Tenure Committee, that decision is reviewed by an Ad Hoc Appeals Committee. The Ad Hoc Appeals Committee makes its recommendation to the President, who "shall review the recommendations ... and all supporting documents" and submit his or her recommendation to the Educational Policy Committee of the Board of Trustees. *Id.* at A35 (§ 8.6.14). Throughout all processes, the Agreement does state that "[f]inal approval rests with the Board of Trustees." *Id.* at A35 (§ 8.6.18). That agreement, however, also states in the same section that accumulated recommendations "shall be given serious consideration in the final decision." *Id.* Such recommendations, indeed "[a]ll materials used in the promotion or tenure process shall become part of the unit member's personnel file." *Id.* at A37 (§ 8.8.1).

Those materials, and any bias which they may contain, thus follow the applicant throughout the process. Bias which may exist in the lower levels of the process is almost guaranteed to reach the administration levels. In fact, as the Agreement states, "[t]he appropriate Vice President and the President of the College shall normally recommend reappointment based upon the favorable recommendation of the majority of those in the department responsible for evaluating a probationary unit member." *Id.* at A25–A26 (§ 7.5.4). The agreement does not make the same statement about unfavorable recommendations, but at the very least it evidences a policy of giving significant weight to the recommendations of the applicant's departmental colleagues.

The documents variously called the "supporting documents," the "personnel file," and "the complete dossier" thus become the repository of the "value judgments by those responsible for making promotion and tenure decisions," which the Agreement acknowledges "will always play a role in determining

who is promoted or granted tenure." *Id.* at A27 (§ 8.1.2). What the Agreement does not acknowledge, however, and must be true, is that the "documented evidence ... used to support the decisions" reflects those value judgments. *Id.* Such judgments may relate to more than an applicant's professional competence, recognition, and service. *See id.* at A32–A33 (§ 8.5.2). They may relate, as plaintiff alleges in this case, to a committee member's distaste for an applicant's national origin.

For these reasons, the Court holds that according to the Agreement (D.I. 48 at A17–A39), the following individuals are agents of the college because they participate in the promotion and tenure process to such an extent they significantly control or influence the decisions which govern some aspect of the compensation, terms, conditions or privileges of the employment of an applicant for promotion and tenure: (1) Departmental Personnel Committee members, including the Committee Chairperson; (2) Promotion and Tenure Committee members, including the Committee Chairperson; (3) Ad Hoc Appeal Committee members, including the Committee Chairperson; (4) Vice Presidents; (5) Presidents; and (6) Board of Trustee members, including those sitting on the Educational Policy Committee. Because the factual record is incomplete in this case, the Court does not decide whether the promotion and tenure process functioned according to the Agreement.[7] Those and other factual issues remain for trial.

## IV. CONCLUSION

The Court holds college employees below the administration level are "agents" of the college as defined in § 2000e(b) of Title VII, so long as they participate in the promotion and tenure process to such an extent they significantly control or influence the decisions which govern some aspect of the compensation, terms, conditions or privileges of employment. With respect to that process as it functions pursuant to the Collective Bargaining Agreement, the Court further

finds the following individuals are agents of the college: (1) Departmental Personnel Committee members, including the Committee Chairperson; (2) Promotion and Tenure Committee members, including the Committee Chairperson; (3) Ad Hoc Appeal Committee members, including the Committee Chairperson; (4) Vice Presidents; (5) Presidents; and (6) Board of Trustee members, including those sitting on the Educational Policy Committee.

An appropriate order will issue.

---

7. That is, if defendant used a different promotion and tenure process than the one described in the Agreement, that process must be evaluated sepa-

rately to determine whether its participating individuals were "agents" under § 2000e(b) of Title VII.