**Karen Renee MERTIG, Plaintiff,**

**v.**

**MILLIKEN & MICHAELS OF DELAWARE, INC., a Delaware corporation, Defendant.**

**Civ.A. No. 95–58–MMS.**

United States District Court, D. Delaware.

May 1, 1996.

Douglas B. Catts, and Noel E. Primos, of Schmittinger & Rodriguez, Dover, Delaware, for plaintiff.

Thomas L. Ambro, and Helen M. Richards, of Richards, Layton & Finger, Wilmington, Delaware, (Danielle Callen, Metairie, Louisiana, of counsel), for defendant.

## *OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

### I. Introduction

Plaintiff Karen Renee Mertig ("Mertig" or "plaintiff") has brought this action against defendants Milliken & Michaels, Inc. and Milliken & Michaels of Delaware, Inc. ("MMD" or "defendant"), alleging sexual harassment and constructive termination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* This Court has jurisdiction over the case pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e *et seq.* A Stipulation of Dismissal and Order dismissing Milliken & Michaels, Inc. was signed by the Court on April 18, 1995. Docket Item ("D.I.") 17. Before the Court is defendant MMD's motion for summary judgment, which was argued on April 2, 1996. For the reasons set forth below, MMD's motion for summary judgment will be denied.

### II. Facts

Because defendant has moved for summary judgment, the facts will be recited in the light most favorable to plaintiff. MMD is a commercial collection agency and employs approximately 85 people in Delaware. D.I. 29 at Exhibit ("Exh.") G. Plaintiff was hired by MMD in October, 1993 as a sales trainee in the sales department of the Dover, Delaware office. D.I. 36 at B–19–B–20. Plaintiff's performance was outstanding in the beginning of her six-month tenure at MMD, far exceeding her monthly sales quota and earning the distinction of Sales Trainee of the Month in November, 1993. D.I. 36 at B–35.

Plaintiff's job in the sales department consisted of making telephone calls to companies to determine whether they had any outstanding, or "bad," debts. If the company had bad debts, plaintiff then explained the debt collection services offered by MMD and attempted to sell those services to the company. D.I. 36 at B–76–B–77. Once a salesperson succeeded in placing an account with a company, the account would be transferred to collectors who made efforts to collect on the debts. Within seven days, the salesperson would contact the collectors to determine whether progress had been made to collect the debts. *Id.* at B–77. Each salesperson was given a period of thirty days in which to attempt to collect on the account, after which point, the account would be transferred to the Client Services Department ("CSD") to handle. *Id.* The salesperson who handled the account had the option to transfer the account to CSD before the thirty day period elapsed. *Id.* An account which is "closed" by CSD after being transferred nonetheless generates secondary fees, or a percentage commis-

sion, for the procuring salesperson. *Id.* at B–78.

In November, 1993, Freddie Travis ("Travis") became plaintiff's supervisor. From the beginning, he repeatedly used sexually explicit language and gestures. These were directed at times towards the entire sales staff, and at other times, directly towards plaintiff. Travis' comments included comments about women's "butts" and breasts, men's genitals, sexual devices and erections. His gestures included sexual jerking motions with his hand and tongue and grabbing the front of his pants. His language was replete with profanity, such as "fuck me, fuck you," "bite this," "the only lady in the pit has more balls than all of you guys put together," and frequent references to plaintiff's soda as "piss." *See generally,* D.I. 35 and Exh. A. Travis denies these allegations. D.I. 36 at B–132–B–136. Comments were regularly made about the clothing plaintiff wore, *id.* at B–203, and on one occasion, male employees dangled a pair of woman's panties for everyone to see, made loud comments about them, and sniffed them, *id.* at B–209. Comments were made in front of plaintiff about some of the male salespeople's sexual exploits, *id.* at B–228, and former male colleagues testified regarding frequent "900" pornographic telephone calls which were made from the office after work, *id.* at B–229. On one occasion, plaintiff made a sexual comment back to Travis, in the form of an insult, stating that "his memory is about as long as his pecker." D.I. 35, ¶ 14. Travis' conduct worsened to the point that plaintiff's work suffered, and she found it hard to concentrate on her job. She suffered physical disabilities as well, including migraine headaches for which she was forced to seek medical attention. *Id.* at B–101.

The general manager of MMD was William Savage ("Savage"), whose office was located adjacent to that of Travis. *Id.* at B–149 and B–117. Both Savage's and Travis' offices faced the sales area in which Mertig and the other salespeople worked. *Id.* Savage was aware of the conduct which occurred on the sales floor with respect to Travis, but made no effort to stop it. *Id.* at B–201–B–202. In December, 1993, plaintiff complained about Travis' conduct and language to Greg McCoy ("McCoy"), a CSD manager, and asked for help, but specifically requested that he omit any reference to her individually. *Id.* at B–41–B–42. Travis' conduct improved for a period of approximately one week subsequent to plaintiff's meeting with McCoy. *Id.* at B–47.

In February, 1994, plaintiff began discussions with Savage, Travis and McCoy regarding a transfer to CSD. *Id.* at B–50. The position contemplated for the transfer was what is referred to as "CSD with a file," meaning a client services position with new clients.[1] The position paid a salary of $2,250 per month, $250 more per month than what plaintiff had been earning in sales, and the transfer was to be effective March 1st. *Id.* Plaintiff did not discuss the reason she wanted the transfer. *Id.* Plaintiff continued to meet with different managers to discuss the transfer; she was first told by McCoy that she might not succeed in CSD, and later by Travis that she would not like working in CSD. *Id.* at B–51. On February 25th, plaintiff spoke with Patricia Wagner ("Wagner"), another CSD manager, and in the course of those discussions, told Wagner about Travis' conduct. *Id.* at B–52. Wagner advised plaintiff to speak to Ken Sliker ("Sliker"), a new CSD manager, about Travis. *Id.* Plaintiff followed Wagner's advice, spoke with Sliker, and was assured by him that he would

---

1. The CSD is divided into two discrete sections. CSD employees with files have computer files comprised of accounts sent from the sales department. Employees who do not have files are in the "letter series." An employee in CSD letter series is given a list of clients who no longer use MMD's debt collection services for whatever reason, and who have been contacted by many different collectors. D.I. 36 at B–102. The companies on these lists have been previously contacted and are generally nonresponsive clients. *Id.* Because these clients are generally nonrespon-

sive, it is more difficult to succeed in the CSD letter series positions. *See id.* at B–199. It is undisputed that a position in CSD with a file is superior to that of the CSD letter series. CSD letter series has been described by MMD's general manager as the "lowest type position," *id.* at B–174, and by a former CSD employee as the "bottom of the barrel," the place salespeople are sent "when they want to get rid of you." *Id.* at B–199. However, both the CSD letter series position and CSD with a file position pay the same salary.

take care of the situation. *Id.* at B–52–B–53. She made a similar request of Mr. Sliker that he keep her name out of any discussions he might have with Travis. *Id.* at B–53.

On March 2, 1994, plaintiff was summoned into Savage's office for a meeting with Savage and Travis. *Id.* at B–55. Travis issued an apology to plaintiff for his behavior, although he later stated that he did not know exactly what he did or said that offended her, *id.* at B–130, and denied most of her allegations, *id.* at B–132–B–141; B–146–B–147. Plaintiff was cut off by Savage when she tried to discuss Travis' conduct, and was told that "there's no need to bring it all up again," that she had her apology, and "[l]et's leave it at that." *Id.* at B–55. Savage said nothing to Travis in plaintiff's presence, although Savage testified that he reviewed a pamphlet on sexual harassment with Travis. *Id.* at B–170.

After the March 2nd meeting, Travis' offensive conduct continued. In addition to the derogatory and insulting language, Travis began to ostracize plaintiff by advising her to cover her ears if she didn't want to hear what he was going to say. *Id.* at B–58. Plaintiff was removed to another location in the sales area, and the remote location made it difficult to hear and learn from her colleagues. *Id.* at B–68–B–69; B–197–B–198. Plaintiff also stated that her fellow employees, who were male, began to avoid contact with her and refused to speak with her. *Id.* at B–69. She also began to find it difficult to get collection assistance from others, as well as from Travis. *Id.* at B–88.

On March 29, 1994, Travis told plaintiff, in connection with one of her accounts, to "stat the client, introduce CSD, and kick it." *Id.* at B–75. By this, Travis was telling her to give a status report to a client regarding its account after a period of only seven days, although she had thirty days to work the account. *Id.* Because no activity had occurred with respect to that particular client's account, plaintiff had nothing to "stat" the client on, and so attempted to verbally inform Travis. *Id.* at B–79. Unsuccessful in that attempt, plaintiff decided to e-mail this message to Travis, but before she was able to do so, he sent her a message that the account

had been taken from her. *Id.* This was the first account which had ever been taken from plaintiff, and to her knowledge, from anyone. *Id.* Plaintiff went into Travis' office to ask why he took her account, and he said something to the effect of "[y]ou wanted something done. You got it." *Id.* at B–80. Plaintiff then attempted to contact Savage, but he was not in his office. *Id.* at B–89. She then left for the day, extremely upset. *Id.* at B–81. The remainder of her accounts were distributed to other salespeople that afternoon. *Id.* at B–93.

The following day, plaintiff went to speak with Savage, and told him she could no longer work for Travis, because the comments and gestures had not stopped. *Id.* at B–90–B–91. Savage told her that she was going to be terminated in any event. *Id.* at B–91. That afternoon, plaintiff was contacted by Kim Sokol ("Sokol"), MMD's comptroller, and was offered a position in CSD letter series. *Id.* at B–94. Plaintiff declined the position because she no longer felt comfortable working for MMD. *Id.* at B–95.

Plaintiff filed complaints with the Delaware Department of Labor ("DDOL") and the EEOC. An investigative memorandum was prepared by the DDOL and found no probable cause to pursue the matter against MMD. D.I. 29 at Exh. G. The DDOL also proposed a no-fault settlement agreement with MMD which offered plaintiff the option of a monetary settlement of $75,000 cash or a sales position in the MMD Boone, North Carolina office, plus moving expenses. The salary was to be negotiated with the Boone office. *Id.* at Exh. C.

Plaintiff sought other employment after being terminated in various different industries. She stated that she had put in "several applications," although the nature of the prospective employers to which she applied is not clear. D.I. 36 at B–96. She also stated that she began to work for a manufacturing company, where she had been working up until the time of her deposition. *Id.* at B–96–B–97. She stated that she also worked at a place called Ron's Mobile Homes, doing cleaning and painting. *Id.* at B–96. Plaintiff testified that she was uncomfortable with going back into the sales field at all, that she

was "turned away from the sales field completely." D.I. 29, Exh. A at A–11. She stated that she sought at least one sales position which was not telemarketing, but the salary did not compare to that at MMD. D.I. 35, ¶ 10.

MMD has moved for summary judgment on the ground that the alleged sexually discriminatory behavior of Travis was not, as a matter of law, sufficiently severe or pervasive to alter the conditions of Mertig's employment and create a hostile working environment. D.I. 29. Further, MMD argues that Travis' actions cannot be imputed to MMD as the employer, because once notified about the alleged harassment, MMD took prompt remedial steps to reprimand Travis and prevent future occurrences of harassment. *Id.* Alternatively, MMD argues that it is entitled to partial summary judgment for front and back pay, because Mertig refused substantially equivalent work from both MMD and an MMD affiliate, and has voluntarily refused to seek substantially equivalent employment. *Id.* MMD has not moved for summary judgment on the constructive termination claim.[2]

Plaintiff has opposed defendant's motion, arguing that defendant, through Travis, subjected her to a hostile work environment which was severe and pervasive, and is liable because it was aware of Travis' actions but did nothing to stop it. D.I. 34. Plaintiff also argues that defendant is liable for both back pay and front pay, because defendant never offered plaintiff comparable employment without condition, and plaintiff mitigated her damages by seeking available comparable employment elsewhere. *Id.*

2. At oral argument, on April 2, 1996, the Court asked counsel for MMD whether she intended to move for summary judgment on the constructive termination claim. Counsel responded that the constructive termination claim, in her opinion, should disappear if the Court grants summary judgment on the hostile environment claim. Counsel also stated that she did not believe the constructive termination claim had been adequately pleaded, and for that reason, she did not brief the issue. The Court finds that the complaint adequately sets forth the elements of a constructive termination claim as required by the

## III. Analysis

Summary judgment will be granted to a moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). A dispute over the facts which might affect the outcome of the case under the governing substantive law will preclude entry of summary judgment. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir.1995). In determining whether the dispute is genuine for purposes of Rule 56, the court's duty is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. In making this determination, the facts must be viewed in the light most favorable to the non-moving party. *See Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1297 (3d Cir.1994). When the allegations of the non-moving party contradict those asserted by the moving party, the assertions of the non-moving party must receive the benefit of the doubt, *id.* at 1297–98, and the non-moving party must receive the benefit of all reasonable inferences. *Sempier v. Johnson & Higgins,* 45 F.3d 724, 727 (3d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995).

### A. Hostile Environment

Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

Third Circuit Court of Appeals. *See Goss v. Exxon Office Sys. Co.,* 747 F.2d 885, 887–88 (3d Cir.1984); *Sheridan v. E.I. DuPont de Nemours & Co.,* 74 F.3d 1439, 1446 (3d Cir.1996); *see* D.I. 1, ¶¶ 7, 14, 20, 23. The Court also notes that to the extent MMD was not on notice of the constructive termination claim, plaintiff further alerted MMD of this claim in her Answering Brief, *see* D.I. 34 at 1. Accordingly, because MMD has not moved for summary judgment on the constructive termination claim, this claim will survive to trial.

§ 2000e *et seq.*, which provides, in pertinent part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....

42 U.S.C. § 2000e–2(a)(1). The term "employer" means "a person engaged in an industry affecting commerce who has fifteen or more employees ..., and any agent of such person...." *Id.* § 2000e(b).

█ The Supreme Court has interpreted Title VII to encompass two distinct types of sexual discrimination actionable under the statute. One is the so-called "quid pro quo" harassment, defined as "harassment that involves the conditioning of concrete employment benefits on sexual favors." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 62, 106 S.Ct. 2399, 2403, 91 L.Ed.2d 49 (1986). A second type of sexual discrimination is known as "hostile environment" harassment, defined as "harassment that, while not affecting economic benefits, creates a hostile or offensive working environment." *Id.* The Supreme Court has recognized the latter theory of sexual harassment in order to eliminate workplace environments with an implicit "requirement that a man or woman run the gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living...." *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson v. Dundee*, 682 F.2d 897, 902 (11th Cir.1982)). The hostile environment form of sexual discrimination is at issue in the case *sub judice.*[3]

█ Against this backdrop, the Supreme Court has attempted to determine what type of conduct is actionable under the hostile environment theory. The *Meritor* Court held that "[f]or sexual harassment to

be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* at 67, 106 S.Ct. at 2405 (quoting *Henson*, 682 F.2d at 904). In an attempt to refine this standard, the Supreme Court later held in *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), that in order to be actionable, the offensive conduct must create an environment that a reasonable person would find to be abusive or hostile. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.* at ——, 114 S.Ct. at 370. In addition to the objective inquiry, the victim must subjectively perceive the environment to be abusive to make out a Title VII claim. "Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.*

Factors listed by the *Harris* Court as relevant to a determination of the existence of a sexually hostile environment include:

(1) the frequency of the discriminatory conduct;

(2) its severity;

(3) whether it is physically threatening or humiliating, or a mere offensive utterance; and

(4) whether it unreasonably interferes with an employee's work performance.

*Id.* at ——, 114 S.Ct. at 371. The Court further stated that "[t]he effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." *Id.*

---

**3.** The term "sexual harassment" is broadly defined to encompass various kinds of workplace conduct including "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." 29 C.F.R. § 1604.11(a) (1985); *see Meritor*, 477 U.S.

at 65, 106 S.Ct. at 2404–05. It is demonstrated by conduct which "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Id.* § 1604.11(a)(3).

The Third Circuit Court of Appeals in *Andrews v. City of Phila.*, 895 F.2d 1469 (3d Cir.1990), formulated a five-part, "totality of the circumstances" test which is to be applied to determine whether harassment is so severe or pervasive that the working environment becomes hostile or abusive:

> (1) the employees suffered intentional discrimination because of their sex;
>
> (2) the discrimination was pervasive and regular;
>
> (3) the discrimination detrimentally affected the plaintiff;
>
> (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and
>
> (5) the existence of respondeat superior liability.

*Id.* at 1482. In a footnote, the court explained that "intent to discriminate on the basis of sex," as required in this five-part test, is implicit and should be recognized as a matter of course in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language. *Id.* at 1482 n. 3. The court also noted that the objective inquiry incorporated in factor (4) is "more critical" than the subjective inquiry, because the objective inquiry requires the finder of fact to determine whether the work environment is sexually hostile. This point is critical in the present case, since it suggests the inquiry is best left for a finder of fact, rather than a court at the summary judgment stage. *Cf. West v. Philadelphia Elec. Co.*, 45 F.3d 744, 753 (3d Cir.1995) (applying *Andrews* five-part test to racially hostile environment suit brought under Title VII).

In response to a motion for summary judgment, the non-moving party must "go beyond the pleadings" and by depositions or other sworn testimony, designate "specific facts showing that there is a genuine issue for trial." *General Ceramics Inc. v. Firemen's Fund Ins. Cos.*, 66 F.3d 647, 651 (3d Cir.1995) (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553). In this case, plaintiff must point to specific facts alleged in her deposition and affidavit which demonstrate that there is "sufficient evidence to allow a reasonable jury to find for [her] at trial." *See Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir.1995). The Court will examine the record for evidence sufficient to meet each of the five factors required by the Third Circuit Court of Appeals in *Andrews, supra.*

### 1. *Suffering of Intentional Discrimination Because of Sex*

In this case, plaintiff provided an abundance of evidence of record which, taken as true, would allow a reasonable jury to find in her favor on the issue of whether she suffered intentional discrimination on the basis of sex. Plaintiff's deposition and affidavit are replete with instances of allegedly derogatory, insulting, intimidating and vulgar language and conduct by Travis. She also points to various occasions on which Travis used sexual innuendo and pornographic material. *See, e.g.*, D.I. 35, Exh. A at 1–3 (referring to Travis' language, including "fuck me," "bite this," "I'm getting a hard-on"; referring to comments about women's "butts" and breasts and the length of his penis; referring to conduct such as placing a magazine selling sex toys on plaintiff's desk and telling her to buy a vibrator for men, and wearing an ear muff over his genitals). Plaintiff also offers testimony about an incident in which a pair of woman's panties were displayed on the sales floor, about which loud comments and vulgar gestures were made. D.I. 36 at B–209.

Plaintiff's allegations were corroborated by the testimony of Carolyn Outen ("Outen"), one of plaintiff's former colleagues, who not only testified that she witnessed Travis' language and conduct on a regular basis, but that she eventually transferred out of the sales department in order to escape the abuse:

> Counsel for Plaintiff: Were those comments sexual in nature?
>
> Outen: Yes, with regard to the panties and getting them.
>
> Q. Was this done in front of Mrs. Mertig, also?
>
> A. Yes.
>
> Q. Why did you move from sales to CSD?
>
> A. Because I wasn't comfortable in primary sales. I didn't like being beaten, not

physically, but mentally beaten. I had talked to Greg McCoy and asked him about transferring over. Originally when I was hired in Milliken & Michaels, Greg McCoy was opposed [*sic*] to be my boss. I would have been away from Fred [Travis].

Q. You said beating. Did that include the sexual comments?

A. That's exactly what it means. . . .

Q. Those remarks included sexual?

A. Yes.

Q. They included sexual comments?

A. Yes.

Q. And gestures?

A. Yes.

Q. There were a lot of gestures?

A. A lot of gestures.

*Id.* at B–209–B–210; *see also id.* at B–215–B–216 (Deposition ("Depo.") of Dorrie Moore); and B–225–B–227 (Depo. of John Reed); and B–236–B–242 (Depo. of John Young) (all corroborating plaintiff's testimony). This evidence, taken as true, clearly demonstrates intentional discrimination on the basis of sex. As the Third Circuit appellate court noted in *Andrews, supra,* innuendo and sexual derogatory language rise to the level of "intent to discriminate on the basis of sex" as a matter of course. *Id.* at 1482 n. 3. Therefore, the Court concludes that this prong of the five-part inquiry has been satisfied.

### 2. *Pervasive and Regular Discrimination*

The sheer number of allegations made by Mertig in her affidavit and deposition demon-strates that there is at least a jury question as to the pervasiveness and regularity of the discrimination.[4] *See Andrews,* 895 F.2d at 1484 ("Harassment is pervasive when 'incidents of harassment occur either in concert or with regularity.' ") (quoting *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2d Cir. 1987)); *see also* D.I. 35 at Exh. A; D.I. 36 at B–37–B–66. Mertig testified that these types of comments were made "every day, every hour, several times an hour, multiple times a day." D.I. 36 at B–43. Outen testified that Travis made these comments "many times" a day. *Id.* at B–195. She stated that on some days, he made these comments in "great quantity." *Id.*

Plaintiff additionally provided the testimony of other employees at MMD. Dorrie R. Moore ("Moore"), who worked at MMD for approximately nine months, testified that while working under Travis, she witnessed on numerous occasions all of the comments and gestures set forth in plaintiff's affidavit. *See* D.I. 36 at B–215. Moore testified that Travis' conduct took place in front of the entire staff, and said it took place "regularly" and "very often." *Id.* at B–216. Male MMD employees also witnessed and withstood the offensive language and conduct. John L. Reed, who worked for approximately a year and a half in the MMD sales department, stated that Travis' conduct and language was a regular occurrence at work, that his choice of obscene words was "just common language," and that Travis would "start [the] day off" with such language. *Id.* at B–225–B–227. He also testified that Travis and others called "900" numbers, meaning

---

**4.** MMD cites a number of cases in its brief in which summary judgment was granted in favor of the employer-defendant on hostile environment claims. *See, e.g., Johnson v. Tower Air,* 66 FEP Cases 918, 925, 149 F.R.D. 461 (E.D.N.Y. 1993) (nine incidents of abusive conduct over two week period does not give rise to hostile environment claim); *Rabidue v. Osceola Ref. Co.,* 805 F.2d 611, 622 (6th Cir.1986) (vulgar language and sexually oriented posters did not give rise to hostile environment claim). However, the Third Circuit Court of Appeals in *Andrews* expressly stated that if five factors are met, a Title VII hostile environment claim has been sufficiently alleged. MMD then argues that the cases cited by plaintiff, in which hostile environment claims were satisfactorily alleged, are inapposite because in each of those cases, the level and nature of the discrimination far exceeded the alleged discrimination in the present case. *See, e.g., Meritor,* 477 U.S. 57, 106 S.Ct. 2399 (plaintiff coerced into having sexual relations with supervisor out of fear of losing job, was fondled in front of other employees, and was forcibly raped on several occasions); *Andrews,* 895 F.2d 1469 (plaintiffs suffered abusive language, destruction of property, anonymous phone calls and physical injury). However, the Supreme Court in *Harris* was careful to note that the facts of *Meritor* and other hostile environment cases "merely present some especially egregious examples of harassment," rather than "mark the boundary of what is actionable." *Harris,* 510 U.S. at ——, 114 S.Ct. at 371.

pornographic numbers from the office after work. *Id.* at B–226–B–227. Another male former MMD employee, John Young, testified that he also witnessed the language, gestures and 900 telephone calls, and stated that these occurred "basically on a daily basis." *Id.* at B–236–B–242. In light of the abundance of corroborating testimony to the effect that Travis' sexually explicit and vulgar language took place on a regular basis, plaintiff has met her burden to provide evidence that the harassment was sufficiently pervasive and regular to survive summary judgment.

### 3. *Discrimination Detrimentally Affected Plaintiff*

▌ Mertig has sufficiently alleged that the discrimination detrimentally affected her. She first states that she began to experience physical discomfort which she alleges was brought on by the harassment. She states she began to experience "insufferable headaches" during the period in question, which progressively worsened until she began to have dizzy spells and feelings like she was going to pass out. D.I. 36 at B–98–B–99. These headaches resulted in the necessity to visit the doctor and receive migraine treatment. *Id.* at B–99–B–100.

Mertig also testified that the alleged harassment affected her in terms of her ability to perform her job responsibilities, and created a hostile environment with respect to her fellow employees. She alleges that Travis' comments and gestures made it "tougher all the time," and that it was "getting harder to concentrate." *Id.* at B–48. After the matter was brought to the attention of Savage, and Travis issued his apology, Mertig testified that when Travis wanted to resume the use of his harassing language, he would preface it with statements in front of everyone such as "Oops, cover your ears, Karen. I wouldn't want to harm them with what I'm about to say. Wouldn't want to hurt her ears." *Id.* at B–58. She alleges that other male salespersons began to make the same prefatory comments, such as "Whoops, where's Karen? Wouldn't want to harm her ears." *Id.* She further alleges she was moved away from the sales "pit" to a more remote cubicle, and as a result, could not hear the sales techniques of her colleagues and could not get any help from them. *Id.* at B–67–B–68. She stated that "[a] lot of the men who would speak to [her] before didn't speak to [her]," and that it was hard to get assistance on accounts from others, including Travis. *Id.* at B–69; B–88. The Court concludes that plaintiff has satisfied her burden on this factor.

### 4. *Discrimination Would Detrimentally Affect Reasonable Person Of Same Sex in that Position*

▌ This factor requires the Court to make an objective determination regarding the effect the discrimination would have on a reasonable person of the same sex in the same position. As noted above, the objective inquiry incorporated in this factor is "more critical" than the subjective inquiry, because the objective inquiry requires the finder of fact to determine whether the work environment is sexually hostile. *Andrews,* 895 F.2d at 1482. In addition to plaintiff's testimony, Outen testified to the effect that the atmosphere created by the remarks and gestures of Travis were "very intimidating." D.I. 36 at B–196. She testified that his comments were "embarrassing," and summed up her feelings as follows:

> Counsel for Plaintiff: What was it like being exposed to these comments?
>
> Outen: It was embarrassing. It was very similar to working in a [*sic*], I felt that there was a lot of hostility with [Travis] and my being there. I also felt like it was very similar to a concentration camp that you have to put [*sic*] with it. You can't get out unless you leave. There was no alternative.
>
> Q. Why did you think there was hostility with your being there?
>
> A. Number one, because I was female. That was the primary one.

*Id.* at B–195. Outen later testified that she requested a transfer out of sales into CSD in an effort to remove herself from the harassing environment created by Travis. *Id.* at B–210. Another female former employee corroborated the environment in the sales department. *See id.* at B–215–B–216 (Depo. of Dorrie Moore). While it is difficult to

determine, based on the record, whether a reasonable person would have been detrimentally affected by this environment, plaintiff offered corroborating testimony from which an reasonable inference can be drawn that the atmosphere was intimidating and hostile to a reasonable person of the same sex in the same position. Like the factors discussed above, plaintiff has met her burden.

### 5. Existence of Respondeat Superior Liability

MMD argues that the actions of Travis cannot be imputed to MMD as the employer. While not framed as such, MMD is arguing that plaintiff has failed to allege respondeat superior liability, as required by the fifth prong of the *Andrews* test. While the Supreme Court declined to address the issue of employer liability in *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408, it did state that it "agree[s] with the EEOC that Congress wanted courts to look to agency principles for guidance in this area." *Id.* The Third Circuit Court of Appeals has interpreted this language by broadly holding that under general Title VII law, "the act of a supervisory employee or agent is imputed to the employer." *Levendos v. Stern Entertainment, Inc.,* 909 F.2d 747, 751 (3d Cir.1990); *see also Dutt v. Delaware State College,* 854 F.Supp. 276, 280 (D.Del.1994) ("Courts consistently have construed the terms "employer" and "agent" liberally to effectuate the remedial purpose of Title VII.... In general, that liberal construction means that the acts of supervisory employees are imputed to their employer.") (citations omitted).

5. By reference to other courts, the *Levendos* court adopted the definition of "agent" as follows:

A person is an agent under § 2000e(b) if he participated in the decision-making process that forms the basis of the discrimination. *Id.* at 752 (citations omitted).

6. MMD argues that it is absolved from liability because Savage, acting as general manager, had no knowledge of the alleged harassment until plaintiff complained to him on the one occasion. MMD argues that Savage then took affirmative steps to end the harassment, including holding a meeting with Travis and plaintiff, requiring Travis to apologize, and allegedly reviewing a pam-

The analysis begins with the issue of whether Travis is deemed an agent of MMD. In *Levendos, supra,* the court found that a person with the power to hire and fire anyone within the establishment, or at least influence hiring and firing decisions, is a supervisory employee or agent. *Id.* at 752;[5] *see also Verde v. City of Phila.,* 862 F.Supp. 1329, 1334 (E.D.Pa.1994) (same); *cf. Dutt,* 854 F.Supp. at 282 (college professors are agents "so long as they participate in the promotion and tenure process to such an extent they significantly control or influence the decisions which govern some aspect of the compensation, terms, conditions or privileges of employment.") (collecting cases). Based on a review of the record, it is clear that Travis is an agent of MMD. By his own testimony, he admits to having the power to hire and fire persons in the sales department:

> Counsel for Plaintiff: Did you have any influence on hiring and firing of people in the Dover office when Karen Mertig worked there?
>
> Travis: Yes, sir.
>
> Q. What were your duties in that regard?
>
> A. I don't understand the question.
>
> Q. Well, you said you had some influence on hiring and firing; what would you do?
>
> A. I would train; I would monitor activity and I would expect compliance. If that compliance wasn't met, typically a salesperson would be terminated if they [*sic*] failed to comply.

D.I. 36 at B–123–B–124. Since Travis is deemed an agent, his actions are appropriately imputed to MMD.[6] Having found that

phlet on sexual harassment with Travis. MMD argues that these actions constituted prompt remedial measures which, coupled with the fact that plaintiff never complained again, serve to cut off any potential liability on the part of MMD.

As an initial matter, the Court need not reach the issue of actual or constructive knowledge on the part of Savage and the related issue of prompt remedial measures, because the Court has already found that Travis is an agent of MMD. However, a review of the record suggests that Savage *did* in fact have, if not actual knowledge, constructive knowledge of Travis' behavior. When asked if Savage ever heard the types of comments that Travis was making, Outen testified that Savage had heard them on several occa-

plaintiff has satisfied the fifth factor required for a hostile environment claim, the Court concludes that the five-part *Andrews* test has been satisfied, and plaintiff's claim should go forward. Defendant's motion for summary judgment on the hostile environment claim will be denied.

### B. Front and Back Pay: Failure to mitigate

MMD alternatively has moved for partial summary judgment for front and back pay on the grounds that Mertig refused substantially equivalent work from MMD and an MMD affiliate, and voluntarily refused to seek substantially equivalent employment. Plaintiff responds by arguing that she did not fail to mitigate, because MMD did not offer her a substantially equivalent job without condition, and that she sought available substantially equivalent employment elsewhere. Plaintiff also argues that even if the Court finds that she did not meet her statutory duty to mitigate, her awards of front and back pay should simply be reduced by the amount that she could have earned if she had obtained alternative employment.

■ The Supreme Court has explained that a Title VII claimant's duty to mitigate damages, set out in section 706(g), 42 U.S.C. § 2000e-5(g),[7] requires the claimant to use "reasonable diligence in finding other suitable employment." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982). Although the claimant "need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied." *Id.* at 231–32, 102 S.Ct. at 3065–66 (footnotes omitted). The Court explained that back pay damages will be tolled if the employer *unconditionally* offers the claimant the job he sought, allowing the employee to minimize damages. *Id.* at 232, 102 S.Ct. at 3066. However, the Court noted that an applicant or discharged employee is not required to accept a job by the employer on the condition that the employee's claims against the employer be compromised. *Id.* at n. 18.

■ While the duty to mitigate is imposed upon the claimant by statute, the burden is on the *employer* to demonstrate that the claimant failed to mitigate damages. *Robinson v. Southeastern Pa. Trans. Auth.*, 982 F.2d 892, 897 (3d Cir.1993); *Anastasio v. Schering Corp.*, 838 F.2d 701, 707 (3d Cir. 1988). The employer may satisfy this burden in two ways: (1) by proving that it offered the discharged employee a job that was substantially equivalent to his or her former position; or (2) by establishing that other substantially equivalent positions were available to the former employee and he or she failed to use reasonable diligence in attempting to secure such a position. *Anastasio*, 838 F.2d at 708. Significantly, the *Anastasio* court noted that the jury determined the issue of job equivalency. *Id.*

■ "Substantial equivalent" employment is defined as "employment that affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has been discriminatorily terminated." *Booker v. Taylor Milk Co.*, 64 F.3d 860, 866 (3d Cir.1995); *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir.1991) (same) (citing *Sellers v. Delgado Community College*, 839 F.2d 1132, 1138 (5th Cir.1988)). On this issue, courts have held that two jobs are *not* substantially equivalent merely because they offer similar salaries. *See Floca v. Homcare Health Servs., Inc.*, 845 F.2d 108, 111 (5th

sions, but rather than do anything about them, he "chuckled" and "laughed" about it. D.I. 36 at B–201–B–202. Furthermore, a reasonable inference of constructive knowledge can be drawn from the fact that Savage's office was adjacent to Travis' office, both of which faced the sales floor. It is certainly reasonable to assume he witnessed at least some of the language and gestures Travis is alleged to have used on such a regular basis. *See Levendos*, 909 F.2d at 753 ("[i]t would defy credulity to suggest that [the general manager]

personally did not have knowledge that [plaintiff] was being victimized by the activities of his close associates. . . .").

**7.** 42 U.S.C. § 2000e-5(g) provides that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."

Cir.1988); *Williams v. Albemarle City Bd. of Educ.*, 508 F.2d 1242, 1243 (4th Cir.1974).

A review of the record indicates that defendant's motion for partial summary judgment must be denied. There is a genuine issue of fact on the issue of job equivalency. In her deposition, Mertig described the positions which were offered her: the CSD letter series position she was offered on the day she was terminated, and the Boone, North Carolina sales position offered her as part of a no-fault settlement agreement with MMD. MMD argues that these jobs were substantially equivalent to the sales position plaintiff formerly held, an argument plaintiff rejects. MMD further challenges whether plaintiff used reasonable diligence in seeking alternative employment which was available to her.

While defendant initially raised all three challenges in its briefs, at oral argument, defendant conceded that it had not met its respective burdens in connection with two of the three challenges. First, with respect to the Boone position, given the fact that acceptance of the position would require plaintiff and her family to move out-of-state, and the fact that the salary there was still to be negotiated, MMD conceded that the Boone position was *not* substantially equivalent to plaintiff's former sales position. Second, defendant further conceded that it had not met its burden under the law in the Third Circuit to demonstrate that (1) other substantially equivalent positions were available to plaintiff and (2) plaintiff failed to use reasonable diligence in attempting to secure such a position. *See Anastasio*, 838 F.2d at 708. Having conceded that it has not met its burden to demonstrate the substantial equivalence of the Boone position, and the availability of alternative positions which plaintiff failed to use reasonable diligence in obtaining, the Court will limit its discussion to the remaining contention: the substantial equivalence of the CSD letter series position to plaintiff's former sales position.

After her termination on March 30, 1994, Mertig was offered a position in the CSD letter series, a position which Mertig regarded as lower in status than the position from which she was terminated. Mertig declined the offer, and commented upon the position as follows:

Counsel for Plaintiff: Let me ask her one thing. There was some talk about you wanted [*sic*] a CSD job earlier on. Then you were offered one on March 30, 1994; is that correct?

Mertig: Yes.

Q. Was there any difference in those two?

A. Yes, there was. In the offer back in, I think it was February of 94, I was offered a CSD position with a file, which means a computer file which are sales reps sending their files over. And the offer of March 30th, there was an offer of letter series which is completely and totally different.

Q. Okay.

A. From what I understand, letter series was a list of clients who no longer used the company for various reasons who had been contacted by many different reps and collectors.

Counsel for Defendant: Were you offered a lesser rate of pay in letter series?

A. No; it was at the same rate.

Q. In the letter series file do I understand that there are the same amount of clients as in a regular—I'm going to use that word for lack of a better word—in a regular CSD file?

A. In letter series you are calling off a paper. You don't even have a computer file. Letter series are clients who no longer, like I said, use the company for various reasons, mainly because they have been bugged to death.

Q. Did you discuss with anybody the pros and cons of letter series before declining the offer?

A. No, I did not.

Q. Do you know whether people who have had a letter series file go on to be successful sales people in the company?

A. I don't have any knowledge of that.

Q. So what did you base your opinion on that the letter series was a lesser job than a regular CSD position?

A. I knew that Carolyn Outen worked letter series. She discussed it quite a bit

with me, what all she went through with it. I don't know that she went on to greater things in the company because she left the company.

Q. That was all you based your opinion on?

A. I don't know. To my recollection. I don't personally know anybody else that worked in letter series.

D.I. 36 at B–102–B–104. Mertig's former colleague Outen, to whom she refers in her deposition, had the following to say about letter series:

Counsel for Plaintiff: What is letter series like?

Outen: I personally think that it is where they want to get rid of you. It is hard to succeed in letter series because everything that you could do wrong with a client, everything that could ever go wrong is done with those accounts. And it is your job to try to turn them back around to come to Milliken & Michaels. You have to do whatever it is that you can do to convince them that Milliken & Michaels is going to be what they need, you know, and you are sorry for what happened.

Q. When you were there at CSD, was there any control about which accounts you got?

A. Yes. I got letter series.

Q. Which meant?

A. I didn't get any, I got the bottom of the barrel. I think maybe on two occasions towards the end of February, Greg Gordon was able to transfer some accounts over to me, and then the beginning of March when I moved over to Adam's file, Pete Beutler was sending files over to me. Prior to that, I couldn't get a direct kick over.

Q. Why not?

A. Because I guess I was in letter series. *Id.* at B–199–B–200.

MMD has submitted affidavits of members of its management which state that a position in letter series is virtually the same as a position in sales. Typical of their opinions regarding the equivalency of opportunities and working conditions of the two positions is the statement of Savage:

14. In general, the pay scale, promotional opportunities, compensation and job responsibilities are almost identical at each level. As someone progresses through training and builds a book of business, their jobs are the same. The only difference is the speed with which one advances through the system.

15. Every sales person at M & M works either in a cubicle office [*sic*] with a telephone and computer. The only variance in working conditions is one's manager.

D.I. 31, ¶ 14, 15 (Affidavit of William Savage). However, in his deposition, Savage testified that the CSD letter series position is the "lowest type position." D.I. 36 at B–174.[8]

█ In light of the disputed issue of job equivalency between Mertig's prior sales position and the CSD letter series position, the Court concludes that this issue is more appropriately resolved by the trier of fact. *See Anastasio,* 838 F.2d at 708. Summary judgment will therefore be denied.

### IV. Conclusion

Given the statements in plaintiff's deposition, affidavit and the sworn statements made by others which are part of the record, fact issues remain which should be determined by the trier of fact. An order denying summary judgment will be entered.

---

**8.** At oral argument, counsel disagreed on the issue of whether Savage was referring to the "lowest type position" in the entire company, or merely the "lowest type position" in CSD. MMD argues that Savage was only referring to CSD when he made that statement, and conceded that the CSD letter series position was lower in status than a position in CSD with a file. MMD's position is that the CSD letter series position was "substantially equivalent" as a matter of law to the primary sales position formerly held by plaintiff. Plaintiff, not surprisingly, argues that Savage was referring to the "lowest type position" in the entire company, and therefore, the CSD letter series position, by the general manager's own admission, was not substantially equivalent as a matter of law to the sales position plaintiff formerly held.